Good morning, Your Honors. David Henkin before you again, this time on behalf of appellants and plaintiffs below, Ilio Ulloa-Oklani Coalition, Naimi Pono, and Kipuka. I would like to reserve five minutes for rebuttal, please. May it please the Court. In California v. Block, this Court noted that the public comment procedures are at the heart of the NEPA process. NEPA's own implementing regulations state that the alternatives analysis is the heart of the Environmental Impact Statement. Regardless of which of these standards the Court considers today, the Army's actions with respect to the decision to convert the Second Brigade to a Striker Brigade in Hawaii went straight to the heart of NEPA and failed to comply with its basic requirements. Moreover, in making the decision to pursue the conversion only in Hawaii at the programmatic stage, where there was absolutely no consideration of site-specific impacts, indeed the word Hawaii doesn't appear anywhere in the document, and there was no consideration of site-specific alternatives, the Army failed to take a hard look at the environmental impacts of its decision, which is the core requirement of NEPA. You contend that they also failed to do that in the site-specific EIS. In the site-specific EIS, we contend that they failed to look at site-specific alternatives. There clearly was a site-specific impact analysis, but only with respect to two virtually identical alternatives, and identical is a word that was used in the site-specific record of decision, as between what they ultimately decided to do and what they called a reduced land alternative that's only different from the preferred alternative, was a slight reduction in the size of the South Range area that we've just discussed, and the movement of one of over 20 training facilities from Oahu to Big Island. I was getting to the decision that the conversion should be in Hawaii, as opposed to elsewhere. Well, we submit, Your Honor, that the decision that the conversion should be in Hawaii, as opposed to elsewhere, was made at the programmatic level. I know you contend that, and the ROD that was issued after that programmatic decision indicated that the site-specific considerations for the location would have to satisfy NEPA, as I understand the ROD. Well, the programmatic environmental impact statement says, the record of decision says several things. First of all, it says, for the interim striker brigades, and so just so we're clear, there were two initial striker brigades that were converted at Fort Lewis in Washington. One of them actually is the first brigade of Hawaii's 25th Infantry Division, based on a 1995 realignment of forces. So there were two initial brigades. Then there was a decision at the programmatic stage to convert an additional four brigades, of which the 25th Infantry in Hawaii was one. And the programmatic EIS is crystal clear that the decision was made that those would take place in place, that there would be no change in location. And the programmatic record of decision states that the selection of the second brigade in Hawaii was contingent on the programmatic EIS. You are correct, Your Honor. It then goes on to say the way in which the brigade will convert in Hawaii is left to a site-specific analysis, which is why the site-specific analysis only looked at alternate ways of converting the brigade, assuming that it remained stationed in Hawaii, and because of the logistics involved with moving a brigade that is housed on Oahu to the mainland and back, the Army said that it would not be a reasonable alternative to do that, that every time you wanted to train. What I got from the SEIS, the Army stated that the Headquarters Department of the Army directed the second brigade to transform in Hawaii because the Pacific Rim is a critical area of interest for the United States. Stationing an interim phase brigade, or stationing such a brigade, in Hawaii allows the President to rapidly respond to events in an area of increasing importance to the national security. So it looks like, at least at that point, the Army is saying we want it here, we want it in Hawaii, because we want to deal with Pacific Rim problems, and we can best do it from Hawaii. That is an accurate statement of what's in the site-specific EIS. It's in our record excerpts at page 338. What they did at the programmatic level is, without any analysis, at the programmatic level they made the decision to convert the second brigade in Hawaii. And that's in the programmatic record decision. It says, interim force brigades will convert in place, and there is an unrelated dispute about whether all transformation will occur in place. They contend that every unit was going to stay exactly where it was, and as we've demonstrated based on the decisions to move the 2nd Cavalry Regiment, and now in July of this year an announcement that everything's moving all around in what the Army described as a complex set of chess moves, that's clearly not the case. It didn't say that in the programmatic, and it's just not accurate. But with respect to the programmatic, they said these four brigades will transform in place, and that the confirmation of the selection of these four brigades was contingent on the finalization of the programmatic EIS. And then they said how we're going to do it, how we're going to carry it out, is going to be examined in the site-specific, which is what they did. Now, you correctly cite to the site-specific EIS giving a rationale why they selected it in the programmatic. And the reason they had to do that in the site-specific is, as we've referenced, both during the preparation of the programmatic, you had all sorts of people at the Army Environment Center raising the red flag that there's absolutely no analysis in the programmatic EIS as to why any of these sites were selected. And not only did they say that at the draft stage when that was circulated to the coordinator, Paul Martin, at the Army Environmental Center, their lawyer, the head of NEPA compliance, all of these people were saying, where's the analysis? Because if you'll recall, when they did the scoping for the programmatic EIS, they said they were going to do environmental analysis of the stationing. They never did it. Now, here is the explanation. Well. And what's wrong with that? The problem with that explanation is because it is conclusory. There is no analysis of it. There's a statement here that we want to transform in Hawaii because it will allow us to respond rapidly to the Pacific Rim. But as we pointed out in the record, the Army at the time it was making this statement had documents in its possession that you could get to hot spots in the Pacific as quickly, if not quicker, from Alaska and from Fort Lewis and Washington, which are two other locations where striker brigades were already formed, were already functioning, already had facilities in place, and like Hawaii, are assigned by the Army to address Pacific Rim issues. So our contention is that, well, we have two contentions that are actually in the alternative, Your Honor. We contend that they decided at the programmatic level to transform in Hawaii and only in Hawaii based on no analysis. And that blatantly violates NEPA. Well, isn't there an analysis that is obvious from geography? Philippines, Burma, Vietnam are closer to Hawaii than Alaska? That is accurate. And Fort Washington? That is accurate, Your Honor. And as I myself and other people raised both at scoping and in comments on the draft EIS and as the Army's own documents just or ratify, in the old, in the day of sailing ships, maybe it makes sense for the Navy because the steam from Hawaii would be closer, but nowadays they don't move these rapid response brigades by ship. They move them by airplane. And Hawaii does not have, when you look at the, Hawaii does not have the airlift capacity to get these soldiers from Hawaii to the Pacific. They have to go. Is that something that Federal judges rather than the Commander-in-Chief should decide? Your Honor, we rely on the rudimentary administrative law as spelled out by the Supreme Court in Bennett v. Speer. The discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decision-making. The whole purpose, NEPA is a procedural statute. It does not tell the Army ultimately what it must decide in terms of the stationing of this brigade. What it says is that it needs to have a transparent process both for its own benefit and for the benefit of the public so we can understand how it got from point A to point B as to what the alternatives are. And, Your Honor, here you asked a question, well, didn't they spell out in the site-specific in Hawaii so it could respond rapidly to the Pacific? Well, the units in Alaska and the units in Washington State are also assigned to respond quickly in the Pacific. And as the record reflects, those are the locations where we have large air bases that will move these brigades, which are expected to get anywhere in the world within 96 hours. So not just the Pacific. They're supposed to be worldwide deployable within 96 hours, which very quickly expands the universe of reasonable alternatives for anywhere in the world. But specifically for the Pacific, there was a striker brigade combat team primer that we included in the record in, I believe it was in 2003, where the Army analyzed how long boots on the ground from different bases to different areas in the world. And that analysis showed that you'd actually get more quickly to areas in the Pacific Rim from Alaska because of the existence of the airlift capacity than you would from Hawaii. And that Fort Lewis was a fraction of a day behind Hawaii. So basically what the Army failed to do was put on the table, both for its own consideration and for the public, which is part of the NEPA process, an examination of these different alternatives so that there would be a reasoned process for its selection of one location over the other. And, Judge Beyer, you were completely correct. At the end of the process, had the Army complied with the mandatory procedures of decision-making, absent violation of some substantive environmental or other law, it would be free to make the decision that it's made. But that's not to ignore Congress's command that agencies, before they make decisions, particularly decisions like this one, with severe environmental consequences, and there is no dispute in this case that the Army is determined that converting the 2nd Brigade in Hawaii will have significant effect on the environment. It will have significant effect on cultural sites. It will have significant effect on endangered species. It will have significant effect on noise and soil and all sorts of things. As the Court may be aware, unlike there was in an earlier Hawaii case there was a reference that a lot of military bases are in the middle of nowhere. Not the case in Hawaii, if you've ever been there. And if you look at the maps and the record, Oahu has a million people on it. It's a small island. And we've got a lot of Army bases. And so these bases are up against people. When they did an analysis for the two initial striker brigades at Fort Lewis, and Fort Lewis is a facility that historically had been used for armored warfare, whereas Hawaii traditionally has been a light infantry, which has a much lighter impact on the ground. They got away with an environmental assessment at Fort Lewis, which tells you something. They found that there was no significant impact to doing striker training at Fort Lewis, whereas in Hawaii they knew that they had to do an environmental impact statement. So Mr. Hankin, wasn't there also a finding, and I can't put my finger on it right now, that the geography of the 1,402 acres in Hawaii was the type of place where they wanted to train the 2nd Brigade because they foresaw that the 2nd Brigade might be fighting in similar jungles or similar areas in the Pacific Rim area? They made a statement that they felt that the geography of Hawaii was similar to areas where they might be fighting in the Pacific. Of course, the areas they might be fighting in the Pacific range from North Korea. Is that an important consideration for the Army? I mean, you can't very well train in the jungles in Alaska. Your Honor, I've referred to parts of the administrative record in which there's a description of the training areas in Hawaii. They are crushed lava. They are golf course-type grassy areas where they actually do live fire training. They don't want obstructions. They want free-ranging areas to which areas of the continental United States are much better suited. So other than having a tropical breeze in your hair and an ocean at your back, there really is nothing specific about Hawaii that would distinguish it from these other areas. I would remind the Court that Alaska and Fort Lewis and Washington State are also assigned to be rapid response units for the Pacific. Why didn't the Army look at at least these alternatives where the record reflects that immediately after issuing the site-specific record of decision, having told the public we can't possibly move a unit, it has to be transformed in place, they take the second armored from Louisiana and move it to Fort Lewis, where if you look at the analysis in the site-specific EIS, they said we don't have room for another striker brigade. Well, they immediately moved it so they have three striker brigades at Fort Lewis. And if you look at what they've announced in July with moving all of the forces in the world to different basing locations, different stationing, they always have three striker brigades at Fort Lewis, which they told us in the site-specific EIS was impossible. And two weeks after issuing the record of decision there, all of a sudden the impossible becomes possible because they want to do it. We would submit that NEPA requires an open and honest discussion of what the alternatives are. And even if, Judge Bea, the Army might have a subjective preference for one place over another, the case law of this circuit says that you can't only look at what you think is the best possible alternative. You have to look at a variety of alternatives. And I would point the Court to the decision in Alaska Center for the Environment that you, Your Honor, authored in which even though the Department of Transportation felt that the best way to transport people to Whittier, Alaska would be a road alternative rather than a rail alternative, nonetheless, the environmental impact statement there thoroughly analyzed the rail alternative in order to justify the agency's ultimate decision that it should adopt the road alternative. Well, that's how NEPA is supposed to work. NEPA is supposed to work where the agency doesn't come in with a single idea and says, this is the only way to go, but looks at a reasonable range of alternatives. I see that my time is limited. I do want to reserve a minute or so for rebuttal, but I would respectfully ask the Court, the issue that we haven't touched on this morning has to go with public notice and public involvement. The requirements for public involvement are evaluated under APA section 706.2d, observance of procedure required by law, not arbitrary and capricious. There is no wiggle room in terms of complying with those mandatory public involvement requirements. The Army would have you believe that the only requirement is Rule 1506.6b, and that's just not the case. As this Court held in Northwest Coalition for Alternatives to Pesticides, those notice provisions in 1506.6b are in addition to all the other public involvement requirements, the scoping requirement under 1501.7, the requirement to circulate drafts of the EIS to state and local environmental agencies in 1502.19, the requirement to affirmatively solicit comments from the public in 1503. During the entire programmatic EIS, one member of the public submitted comments, one. When you got to the site-specific level, you had over 600 people in Hawaii alone submitting comments. I would suggest that the Army's failure to involve the public, which is a basic requirement of NEPA at the programmatic level, where they decided to pursue this transformation programmatically and where they decided to transform in Hawaii is independent grounds for reversing the district court. And I'll reserve my remaining time. Mr. Gray. May it please the Court, Michael Gray on behalf of the Department of Defense. The 25th Infantry Division has been stationed in Hawaii since before Pearl Harbor. The Army in this case announced a program to transform the entire Army, to modernize it to deal with the challenges, national security challenges of the future. Now, that program was about modernizing the Army, not about relocating it. So in the programmatic EIS, the Army made the decision to carve out relocation in that all Army units would be expected to transform in place. They also in the programmatic EIS identified the 2nd Brigade as part of the interim force to transform for strategic reasons. Now, they did not, however, make any irreversible and irretrievable commitment of resources to transforming the 2nd Brigade. And that is why no site-specific analysis was required at the programmatic stage. Instead, what the Army said was we're going to look at site-specific analysis under NEPA and the conversion of the 2nd Brigade is conditioned on that. And having not committed any resources, which is what this Court's case law requires before a site-specific analysis is required, they were not required at that point in time to look at site-specific analysis. So they deferred the site-specific analysis until they had a concrete proposal to transform the 2nd Brigade. At that point in time, they did an extensive site-specific analysis, environmental impact statement that has not been challenged on the analysis. There's no question here that the Army is fully aware of the environmental impacts of transforming the 2nd Brigade in Hawaii. There simply has not been any challenge to that. There's not been any Endangered Species Act challenges to the biological opinions issue. But you have never considered any alternatives. That's right. The Army made the decision that this particular project is a modernization project. It's to transform the Army. And part of that project is to bridge the gap with an interim force that can meet the national security needs while the Army evaluates how to transform the entire Army. You didn't look at any other area in Hawaii, did you? There was a reduced land acquisition alternative, and there was also the no-action alternative, and I believe there was a... But you didn't suggest that maybe some other part of Hawaii, maybe on the Big Island or elsewhere, might be less disruptive of the very unique area which has, as I understand it, plants and animals that are special. I do not believe that the Army considered another site on Hawaii, but I would want to check and make sure about that. Nothing in your record suggests that you did. I've read it pretty well. I understand, Your Honor. But regardless, there's been no claim in this case that a reasonable alternative would have been another site on Hawaii. The only claim that the plaintiffs have made is that... But aren't you the ones who have the obligation to determine that? We do have an obligation to determine that, but the plaintiffs in a lawsuit also have an obligation to bring forward their claims, and I believe the Court is restrained by the claims presented to it in a case like this. And here they've not argued that another location on Hawaii, certainly in alternatives cases, this Court has said that the plaintiffs have a burden of demonstrating that there was another reasonable alternative. The plaintiffs in this case have not made any effort to demonstrate another reasonable alternative on Hawaii. What about Fort Lewis or what about Alaska? Well, as the Army determined, those were not reasonable alternatives for several reasons. First, as I've already stated, this was not about moving Army units around. This was about modernizing them. But second, as has already been discussed, the EIS talks about three factors, the site-specific EIS, and that's that the Pacific Rim is a critical area of importance for national security. I'll agree with that. That's right. That the terrain and conditions on Hawaii are unique, that it's the only mountainous jungle setting where the Army has installations, and that it's a highly deployable, it's the number one rated deployment facility that the Army has. What about the contention that where this expansion is, isn't jungle and it's not mountainous? I'm not aware of the particulars of this site, but I will say that the EIS does say that the terrain and conditions are part of the reason for it. So I think that that's a valid consideration for the Army. Well, if it's true, it's valid. Well, I believe that the EIS, that's what it says, and not just the EIS but also other documents in the administrative record. The selections memo, which is at our supplemental excerpts from 49 to 59, talks about the terrain and ecosystems in Hawaii being unique. Well, are they unique in the sense that the environment to be destroyed is unique, or are they unique for the purposes of training the 2nd Brigade? That's the issue. That's right. Unique in terms of training the 2nd Brigade, that the facilities available at Schofield Barracks most closely resemble the types of terrain that will be encountered elsewhere in the Pacific Rim, which I think makes a certain amount of sense. You have Hawaii in the Pacific Rim, and other island, mountainous, jungle settings that they would be encountered when deployed have the same types of terrain that they have in Hawaii. Schofield Barracks in Honolulu is jungle terrain? The land that they're going to acquire for this is in Hawaii. The adjacent to Schofield Barracks. Pineapple. So, you know, that's a really bad argument, Counsel, to say that they're going to be training in a mountainous jungle. It's not true. Well, that may be correct. I'll have to investigate, and if you'd like, I can file something supplemental with the court on that. But regardless of that particular point, there were other factors as well, including the critical nature of the Pacific Rim for national security and that Hawaii was the number one rated deployability platform. So even if you discount the jungle terrain setting, there were certainly many other reasons for selecting Hawaii for transformation of the 2nd Brigade. But I think the more important point here is that what the Army was engaged in was not a project to relocate forces. It just simply was not part of this project. They were trying to modernize the forces, and they selected this force to transform in the interim. It's going to transform and modernize as part of this project regardless. They selected to transform first for these national security reasons. In effect, you're saying we don't need a NEPA because we've made up our mind this is going to be it. Now, Mr. Martin, who made some rather acid comments about the process, did he not? And he's someone to whom you should have paid some attention. Well, that may be as part of the give and take that goes on any time you're preparing an environmental impact statement. Yes, he voiced his opinion, and the Army considered those actions and came forward with its environmental impact statement, which, again, there's no question here that the Army is fully aware of the environmental impacts of its action, and that's what NEPA is supposed to get at. And it also is aware of the environmental impacts of not doing the action here because of the no-action alternative. So the Army is fully aware of the environmental impacts of what might happen in this case. And what the plaintiffs have suggested is that we can meet our national security needs by looking somewhere else, not that the Army does not know what the environmental impacts are, and those national security concerns are concerns for the President and the Department of Defense. That's all very true, Counsel, but the Army has an obligation to look at other alternatives, and you never seriously looked at another alternative, and that's the problem that I have with it. I'm certainly not going to suggest that the Army doesn't have the authority after a full analysis and a comparison of alternatives to decide this is what we have to do. It's a matter of being fully informed. That's what NEPA is all about. And what happened here, as far as I can see, they decided we're going to do it in Hawaii. End of story. There are two things that I'd like to say. The first is that you have to consider reasonable alternatives, but the alternatives are constrained by the purpose and need of the project. And the agency gets to define what the purpose and need of a particular project is, and unless it is arbitrary and capricious in its definition of the purpose and need, then it can exclude alternatives that don't meet that purpose and need. Here, what the agency said was the purpose of this project is to modernize, and the need for it is to be in Hawaii because of the national security implications, and therefore alternatives that don't meet that purpose and need. So moving the second brigade elsewhere don't need to be considered. And, in fact, for example, there's been no allegation in this case that the Army should have considered transforming a different brigade somewhere else. The plaintiffs have conceded that it was okay to name the second brigade, but they should have looked at an alternative of moving it elsewhere. Well, there's really no different impacts from selecting a different brigade to transform and moving the second brigade. And selecting a different brigade was examined as an alternative in the EIS and rejected as not meeting the purpose and need. And the same thing is true for moving the Army out of Hawaii, that it did not meet the purpose and need for this particular project. Now, Mr. Gray, can we get to the notice problems in the case? Certainly. I'd be happy to turn to notice. This Court said in the Environmental Coalition of Ohio case that for, as the regulations contemplate, actions with effect of national concern, there are two things that must happen. Publish notice in the Federal Register and mail notice to national organizations. And in that case, just as in this case, the agency had published notice in the Federal Register. There's no question that we published notice in the Federal Register. And the plaintiffs themselves were not national organizations entitled to notice. What about their lawyers? Well, that's right. Earth Justice is a law firm. They're not plaintiffs in this action. And it's not clear to me that, as a law firm, they would meet the national organization prong of that test in any event. Are they a national organization? I'm not – I honestly do not know whether – Because the documents or the records show this anyway? No, because they're not a plaintiff in this action, and so there's been no – No argument to that effect? Right. Other than in the reply brief where, you know, Earth Justice is mentioned for the first time as someone who should have been given notice, there's been no raising of Earth Justice in this case. Do the plaintiffs here have standing to raise a third party's interest? I would not think that they would have standing to raise a third party's interest. A third party's standing is very limited, and – Yeah, aren't we doing this under the APA? This is an APA case, yes. Yes. And so I don't think the standing issue is what the agency should have done. Did they do what they should have done? Here, you didn't give notice to any agency in Hawaii? This was at the programmatic stage when you were looking at transforming the entire Army. And so, no, they did not give notice to any organization in Hawaii or at any of the other installations throughout the world that were subject to that programmatic EIS. It's an effect of national concern, and what the regulations say is national organizations and publication in the Federal Register. And this Court has said in Ohio that if you do those two things, that's sufficient. And here, we published in the Federal Register, and there are no national organizations before the court complaint. There are no national organizations who would be interested in this? Is that what you're saying? I'm saying none have come forward and filed a lawsuit saying that they did not get notice and certainly are not a part of this case. The fact that you got only one public comment suggests that this really massive, important decision by the Army was notified the public in a way that they didn't think they had to even comment. Well, I think also there are two parts, two reasons possible for lack of comments. One is that this was a programmatic EIS that applied across the country and that folks would wait as here when we said we're going to do site-specific analyses and it makes much more sense to get involved at the site-specific stage. Well, here, there's no question the Army, when it went into Hawaii to do its site-specific analysis, gave full notice. There were, as the plaintiffs have said, 600 comments, you know, folks participating. And that was the proper stage to participate in this process is when the site-specific analyses for these particular projects go forward, not the programmatic stage. I would also, the plaintiffs have said that 1501.7 imposes some more obligations for notice, but the last sentence of that section expressly says that notice for that section may be provided in accordance with 1506.6, which is why, of course, we contend that the 1506.6 notice was sufficient. How about the other one? Which other? 1502.19. 1502.19 and 1503, both are permissively worded. They require notice to appropriate agencies. Here, the Army can be seen to have made a determination that there were no appropriate agencies for this programmatic analysis other than the ones which they did circulate to, the Department of Interior, the EPA, et cetera. And also, again, these particular plaintiffs are not organizations or agencies listed under that provision, so they would not be able to bring a challenge requesting that circulation under those provisions. You don't think that the State of Hawaii and its various agencies would have any legitimate interest in considering what the Army's plans were for either contraction or expansion or change of mission in Hawaii? Of course they do. But what you're looking at is notice at the programmatic stage. Again, in the programmatic stage. Counsel, at the programmatic stage, that's when you're deciding we're going to reform the Army, we're going to do it in these ways, which will have an impact, particularly in Hawaii, because we've decided that we're going to make a striker unit there. You don't think that the State of Hawaii or its agencies had any interest in commenting on that decision or that it be the first transformation that would take place? Certainly, the notice that we provided, if they did have an interest in that, the notice that we provided in the Federal Register made everyone across the nation, including the folks in Hawaii, aware, the State of Hawaii, aware that this transformation project was going to take place, that there was a draft EIS available. The folks in Hawaii know that they have Army installations there, that the entire Army is transforming, and if they are interested, then they can examine that draft EIS and make comments on it. That notice, in compliance with the regulations, was sufficient at the programmatic stage. And then when we go into the site-specific stage, there is the draft EIS. Did the draft EIS specifically refer to Hawaii as being one of the locations where the transformation would take place in the interim phase? It did. It did. Exactly where? Exactly where in the draft EIS. I do not have that citation with me, but I'd be happy to provide it to the Court. But the draft EIS does list the installations that were tentatively selected to change. If there are no further questions, we would ask that the Court affirm the district court in this case. Thank you. Mr. Henkin, as you come up here, the question that's on my mind is, is counsel correct, is your learned opponent correct in saying that the draft EIS referred to in the Federal Register's programmatic notice did show Hawaii? Absolutely not, Your Honor. The Federal Register notice did not indicate any location that was selected. The draft EIS, if you actually ---- The Federal Register notification ---- Yes. ----contained a reference that a draft EIS was available, correct? Yes. The Federal Register notice ---- Step one. Step one, correct. Step two, do you agree with Counsel Mr. Gray that the draft EIS available and noticed in the Federal Register did mention Hawaii? Yes. It mentioned it. There was a couple of things with respect to that. There was no mention of Hawaii, however. There was one sentence that said we're considering the 2nd Brigade in Hawaii in a multiple hundred-page document. You would never know that if you looked at the draft notice in ---- I'm sorry, if you looked at the notice of availability in the Federal Register, which is all that people in Hawaii would be privy to. You wouldn't know it if you were a State agency. Do you mean to say that the State of Hawaii couldn't have seen that there was a reference to a draft EIS and said we want to copy the draft EIS? They would have no reason to know that Hawaii was implicated by it, by the Federal Register notice, because Hawaii is not mentioned there. I understand that. If they had actually requested the document and had they read through it and had they gotten to the page that mentioned Hawaii, they would have known it, which is precisely why the Army should have circulated it to the State agencies pursuant to 40 CFR 150219A, which says you're supposed to send it to the States that might be affected by your action. And I would concur with Judge Fletcher's observation that here we're not dealing with personal standing to have notice in the sense that you might in, let's say, a civil forfeiture or something like that. We're in an APA setting where there are certain provisions in the National Environmental Policy Act that are there to serve a purpose. The purpose is to ensure that the analysis that the Army does is fully informed. And so those procedures exist to protect my client's interests, the interests of people who use and enjoy and live in Hawaii and would be adversely affected. So Earthjustice, on page 65 of our supplemental excerpts, we are a national law firm, as you very well could take judicial notice based on all the arguments you've heard over the organization was notified. No State agency was notified. If you look at the programmatic EIS contract at page, excerpt of record 193, they spell out that they were going to do specific outreach at the programmatic level to, quote, special publics, including native Hawaiians, that were going to do face-to-face meetings. They didn't do any of this. There is nothing in the record that they did other than publish a federal register notice and a squib in USA Today. And that was it. That was the end of what they deemed to be their compliance with NEPA's mandates to do public outreach. Now, in Environment Coalition of Ojai, that case did not involve claims of failure to involve the public. It just involved a failure to provide notice to a particular plaintiff. And as the Northwest Coalition Against Pesticides makes clear, 1506.6 has to do with some mandatory notice provisions. However, you've got a whole slew of public involvement provisions that are in addition to those. And none of those were complied with here. And none of those are qualified by whether it's national or local. The question is, are there interested publics that you should be affirmatively soliciting? And the record shows that they knew that there were people in Hawaii who had concerns about military activities and the environmental impacts. In fact, the day after they published the notice of scoping at the programmatic level, I filed a lawsuit on behalf of another group in Hawaii, challenging their failure to comply with NEPA at the Makua military reservation on Oahu. So they knew that there were people in Hawaii who were very concerned about this. They didn't bother to contact anyone. They didn't bother to do any of the affirmative solicitation that they're required to do. I see that my time has expired. I would just ask the Court to refer to in the record at page 59 and 60, 192 and 194 and 127, you will see that at the programmatic level, they intended to look at alternate stationing based on environmental considerations, particularly record 127. That is the notice of scoping for the programmatic EIS in which they said they were going to compare the environmental effects of candidate installations. This was all about modernizing the Army, which they knew included moving the units to the place where they could best do their job in an environmentally sound manner. They failed to do that. They failed to look at it. Last statement is, yes, there are some conclusory statements in the site-specific EIS on why they rejected alternatives. This Court has repeatedly held in Klamath-Siskiyou, in California versus Block and other cases that the Army cannot hide behind conclusory statements based on alleged agency expertise. What they need to do is actually explain it in the EIS, not in the record that no one in the public sees, so that there can be a reasoned analysis and dialogue with the public. They failed to do that. We respectfully urge reversal of the district court on numerous grounds. Thank you very much. That will conclude the calendar for today.
judges: B. Fletcher, Thompson, Bea